## JEREMIAH BALDWIN *v.* EDWARD CAMPFIELD.

On a judgment and execution against A. and B., the dwelling-house of A. was levied on and advertised for sale. At the request of A., C., his son-in-law, attended the sale, and made the highest bid; and the sheriff made a deed to C. The sum for which the property was struck off to C. was paid by A.; and the object of the arrangement under which the property was struck off to C. was, to protect the property from the creditors of A. by thus putting the title in C.

On a bill by A. against C., praying that C. might be decreed to convey the property to A., the Court denied relief.

Bill filed in March, 1847, stating, that, on the 29th of June, 1838, one Henry Speer recovered a judgment against Jeremiah Baldwin, the complainant, and one Henry Slough, in the Circuit Court of Essex, for the penal sum of $193.37, on a bond given by Slough and the complainant to the said Speer, with $29.44 costs. That on the 27th of June, 1839, a *fi. fa. de bonis et terris* was issued thereon and levied on a certain dwelling-house and lot of land in Canal street, Newark, then owned by and in the possession of the complainant, and in and upon which the complainant and his family resided, (describing the lot); the said lot having been before that time conveyed to the complainant by Charles Baldwin and his wife, by deed dated December 31, 1830. That the Sheriff of Essex, by virtue of the said *fi. fa.*, advertised the said house and lot to be sold at Stewart's Hotel, Newark, on the 13th of January, 1840.

That the complainant was then in bad health, and reduced in his pecuniary circumstances, and unable, without selling said house and lot, to pay the said judgment. That the said house had long been occupied by him and his family, and that he and his family and their friends were anxious that an arrangement should be made by which the said property might be purchased in, so that the same would continue to be a home for him and his wife and children.

That an arrangement was made whereby one Jacob Alyea and one Charles Taylor, who were friends of the complainant and

his family, agreed to advance $50 each towards the purchase of said property at said sheriff's sale; that one Benjamin Beaston, who was also a friend to the complainant and his family, agreed to lend to the complainant the residue of the money necessary to make the said purchase, (it being supposed that the same would be sold for about the amount of said judgment, $113.26 debt, and the said costs and the expenses,) upon the complainant's note with Edward Campfield, the complainant's son-in-law, as security; and it was thereupon further arranged and agreed, between the complainant and the said Campfield, that the said Campfield should become the purchaser of said property at the said sale, and receive a conveyance of the same to hold in trust for the complainant until said moneys should be repaid, and that the complainant and his family should occupy and enjoy said property, and upon the repayment of the said moneys the said property should belong to the complainant, and be conveyed to him by the said Edward Campfield.

That, on the 11th of April, 1840, the sheriff made sale of the said property; and the said Campfield (the defendant,) in pursuance of the said agreement and arrangement, became the purchaser thereof, for $155, being about the sum due on said judgment and the sheriff's fees; and the sheriff conveyed the said property to the said Campfield, by deed dated April 11th, 1840. That the consideration money for the said purchase and conveyance was paid by the moneys agreed to be advanced and actually advanced by said Alyea and Taylor and loaned by said Beaston as aforesaid; that the said Campfield paid no part thereof of his own money.

That, at the time of the said sale and conveyance, Robert C. Baldwin, a son of the complainant, and who was under 21, was in the employment of said Taylor, and the said money advanced by the said Taylor was afterwards refunded to him by deducting the same from the wages of the said son of the complainant; and the complainant, being then in the employment of the said Alyea, refunded to him, by work and labor, the amount so advanced by him. And that, for the purpose of paying and discharging the residue of the amount paid as the consideration of

38

said conveyance, the complainant's wife negotiated a sale of seven feet of ground off of the westerly side of said lot to one William Hall, for $56; and the defendant, at the request of the complainant and his wife, made a deed to the said Hall for said strip of ground for the said consideration of $56, and the proceeds thereof was applied to the payment of the amount then remaining unpaid of the consideration of the said sheriff's deed; so that the same was fully paid without any sum whatever being paid by the defendant for or on account thereof.

That, at the time of the said sheriff's sale and conveyance, the said property was incumbered by a mortgage, given before the recovery of the said judgment, by the complainant and his wife, to one Caroline Burnet, for $600, and the said sale was made subject to the said mortgage.

That the complainant and his family continued to reside in the said house from the time of said sheriff's conveyance until April 1st, 1844. That, during all that time, the complainant paid the interest which became due on said mortgage, and caused the said house to be insured, and paid the expense of insurance and the taxes assessed upon the premises. That during that time the defendant never set up or pretended to have any beneficial interest in or right to the said house and lot or the rents thereof.

That, shortly previous to April 1, 1844, the complainant and his family, believing it would be for their advantage to reside in another part of Newark for a few years, rented part of a house in Pennington street, for the rent of $50 a year; and it was thereupon agreed and understood by and between the complainant and the defendant, that said house and lot in Canal street should be leased out, and the rent thereof, except so much as would be sufficient to pay the interest on the said $600, should be appropriated to pay the rent of the said premises in Pennington street; it being supposed that the rents of said Canal street property would be sufficient or nearly so for both said purposes.

That, in pursuance of such arrangement, the said Canal street property has since been leased, from year to year, in the name of the defendant, and the rents thereof have been received by

him; and the complainant has been informed and believes, that, out of said rents, the defendant has paid the interest on said mortgage, and the taxes on said premises, and a small sum for the repair of the house.

That the defendant has lately threatened to sell the said house and the complainant is apprehensive he will do so unless restrained &c.

That the defendant refuses to account to the complainant for the rents of said house, or to convey the premises to the complainant, in pursuance of the said agreement and trust upon which he purchased the same.

The bill prays, that the defendant may account for the rents and profits ; and may be decreed to convey the premises to the complainant ; and may be restrained by injunction from conveying or incumbering the premises ; and for such other and further relief &c.

An injunction was allowed.

The defendant, in his answer, admits the judgment and execution of Speer, and the levy under it. Denies that the complainant ever did enter into any arrangement whereby he retained either a legal or beneficial interest in the property. Says he is not informed whether said Alyea and Taylor, or either of them, ever agreed to advance, or ever did advance any moneys to the complainant, or whether said Beaston agreed to loan money to the complainant on his note endorsed by this defendant, for any purpose ; but denies that he ever indorsed any such note for the purpose of effecting said loan, or for any other like purpose.

He denies that any arrangement was ever made by him with the complainant, or with any other person, that this defendant should receive a conveyance from the said sheriff of the said property for the purpose, or with the view of holding the same in trust, in any manner, for the complainant, or for any other person ; or that any arrangement was made by this defendant to convey the same to the complainant. He admits the purchase by him ; but denies that he became the purchaser in accordance with the arrangement stated in the bill and before denied in his answer.

He denies that he paid no part of the consideration money, or that he raised the money to pay the same by a sale of part of the property to William Hall.

He says that the complainant, some time in 1838, he thinks in March of that year, called at his house; that he, not being in at the time, was, on his return home, informed by his wife that the complainant had called; that he immediately called on the complainant at his house; that the complainant then took him apart and handed him a paper; that he examined said paper, and found it was a deed, dated February 7th, 1838, from the complainant and his wife to this defendant, for the premises in the bill mentisned; which deed was, on the 8th of February, 1838, duly acknowledged by complainant and wife, as by a certificate indorsed thereon appears. That when complainant handed him said deed he addressed this defendant in these words, " Boy, take this, it is yours ;" and that nothing whatever was said intimating that this defendant was to hold said property in trust, or for the benefit of the complainant or his family; but that the complainant gave this defendant the said property without any condition or qualification; and that the said deed has ever since remained in the custody of this defendant, except when at the County Clerk's office to be recorded, and is now in the same condition it was when delivered to this defendant. That when said deed was so given to him the premises were subject to a mortgage for $600, and were depressed in price, and worth in market but little more than the amount of said mortgage. That he neglected for a long time to have said deed recorded; and, about June 1, 1839, the complainant called on him, and asked him whether he had his deed recorded, and, on being informed it was not recorded, told this defendant he had better have it recorded; and this defendant accordingly had it recorded, on the 20th of June, 1839.

He admits, that the complainant and his family continued to reside in the premises until April 1, 1844, and continued to pay the interest on said mortgage, and the taxes, and insurance until within six months of said first of April; it being considered, and stated by this defendant, that, although the said in-

terest, taxes and insurance were not a sufficient rent, yet he was willing, in consequence of their relationship, that they should occupy the premises without actually paying to this defendant any additional rent therefor, and he avers, that he requested the wife of the complainant to remain, with the family, longer in the said house; but that she refused, stating that they could not pay the interest, taxes and insurance, and that they had already failed so to do, and that they would not longer stay, that the property belonged to this defendant, and that he must have the benefit of it, and that she was glad it was his, that neither her husband, the complainant, nor her son Robert, could keep and take care of the same.

He says, that he paid the taxes and the interest on said mortgage for the six months preceding April 1, 1844, and has done so ever since; and denies, that he in any manner ever admitted, or that the complainant, until recently, ever insisted that the property did not rightfully belong to this defendant; and denies that he ever made any arrangement or agreement by which he was to pay the rent of the house occupied by complainant since April 1, 1844, as in the bill is alleged; but insists that he has at all times, and in all proper modes, claimed the said property. He admits that he has offered the premises for sale, and submits that he has good right to do so.

He says, that, after the said deed to him was recorded, and on or about April 11, 1840, the complainant called on him and told him that the property was advertised for sale, and that he was desirous this defendant should purchase it at the Sheriff's sale, and that the purchase money was ready for him as soon as he purchased it; that, as soon as the premises were bid off by this defendant, the complainant told him that he must now raise the money on his, this defendant's note, of Benjamin Beaston; and that this defendant then gave his note to said Beaston, which note was endorsed by Jacob Alyea and John Y. Baldwin; that the said note was for something over $100; that this note was protested, and a new note given therefor for $129.26; that this second note was also protested, and a new note given by this defendant therefor. That some person, but who this defendant

does not know, paid a part of said note, leaving a balance of $49.50, which was, on or about December 20, 1843, paid by this defendant to said Beaston.

He says, that, on or before the payment so made to Beaston, he was informed by complainant's wife that William Hall desired to purchase an alley way off of said premises, and on or about February 21, 1844, he conveyed a part of said premises to said Hall, and received therefor $56.

*Jacob Alyea*, sworn for the complainant. I remember the property's being advertised for sale at Sheriff's sale, Mr. Baldwin's property, in Canal street, and I paid $50, and there were other gentlemen that paid. I was to have been one of the purchasers, with Mr. Campfield, and we were to buy it in for the benefit of the family; that was my understanding about it. I attended the sale; was there and conversed with Mr. Campfield; at my suggestion he became the purchaser alone; I advanced $50 towards the purchase. I became one of the friends of the family, to raise money to buy it for the family of the complainant, upon his solicitation, and he requested me to become one of the purchasers. I told Mr. Campfield, at the time of the sale, that there was no use in my being a party, that it was a family matter, and he might become a purchaser alone. I urged it upon him to become a purchaser alone, as he was related to the family, a son-in-law.

*Question.* From the purport of the conversation you had with Mr. Campfield, at that time, was it not your understanding that he was to purchase in the property for the family?

It was my belief so; I guess there can be no mistake about that; that is my honest belief about it; it was the understanding upon which I agreed to become a purchaser, with Mr. Campfield, of the property, that it should be purchased for the benefit of Mr. Baldwin's family; we three were together at the time; Mr. Campfield, Mr. Baldwin and myself, and I believe it was so stated when we three were together; it must have been so of course. The circumstances of Mr. Baldwin at the time of the sale I supposed were poor.

*Cross-examined. Question.* Do you recollect that Mr. Campfield at any time prior to the sale said anything to you as to your becoming the purchaser either alone or with him ?

*Answer.* Either him or Mr. Baldwin, at the public house Mr. Campfield did. Mr. Campfield then rather insisted upon my being the purchaser, but I told him there was no use ; as I said before, at my urgency he agreed to be the purchaser alone. I went to the sale prepared to buy it in, in connection with Mr. Campfield. I do not remember how the payment was made. I remember John Y. Baldwin was to be one of the friends, and he either gave a note and I endorsed it, or we gave a joint note ; at any rate I paid it. I was one of the friends, and I paid $50 ; that is the whole amount I ever paid for that purpose.

*Question.* Do you recollect whether or no, on that note's maturity, you and John Y. Baldwin endorsed a note of Campfield's for about $129 ?

I have no distinct recollection, it might have been so, I don't recollect it, it was possible. A paper purporting to be a prommissory note for $129.26, dated January 14, 1841, being shewn to the witness, he says, the endorsement, " Jacob Alyea," on that note is in his hand writing. (The note is exhibited on the part of the defendant.) I don't remember whether I afterwards endorsed other notes in renewal of that ; I don't remember much about the notes ; I don't remember paying anything but the $50 I have spoken of. Property was not so high in 1839 or 1840, in Newark as it had been before.

*William Hall,* sworn for complainant. I remember the Sheriff's sale spoken of. The property joins me, and my calculation was, that if it was going to be sold for the benefit of the family, that is, to raise all the money it could, I was going to bid on it myself ; but as I understood to the contrary I did not attend the sale. Before the sale I understood from the family that Mr. Campfield was going to buy it in. Sometime before Mr. Campfield was sued on account of this property I went to see him. I said to him, Edward, what is the reason you can't settle this concern and give up the property as it was understood to be ;

and I made the observation to him, as a friend, Edward, you know that this property never cost you anything, and you ought to give it up. And I said to him, further, that he knew that the property didn't bring as much as it was worth, as it was perfectly understood that he was buying it in for the family, and I believe I said to him that I did not bid on it for that reason myself. I said to him, you had better give the deed back as it was agreed on, and he made an observation something like, that mother, or Mrs. Baldwin, as he called her, had made so much to do about it he didn't think he would give it up now. He admitted the property hadn't cost him anything. I purchased a little strip of the lot, seven feet of it, after the Sheriff's sale; the complainant's wife applied to me to purchase it. I agreed with her for it; $8 a foot was the price agreed upon, and I was to pay all the expenses, drawing the deed and moving the fence. I had nothing to do with Mr. Campfield in making the bargain, not a word. He came to me with the deed, and I paid him the money.

*Question.* What was stated to be the object of selling the seven feet to you? (Objected to.) To pay the balance on the judgment lying on the property for which it was recently sold; it was stated by Mrs. Baldwin to be the balance of the judgment upon which the property was bought by Mr. Campfield; it was to pay the balance of the note. Mr. Campfield never told me what was the object of the sale to me. Mr. Baldwin and family continued to live on this property until five years ago next April. They used and occupied it as their own, from the time of the sale until they moved out, as they formerly did. I am not positive, but I think Mrs. Baldwin paid the taxes and the interest on the mortgage. There were repairs put upon the property while they lived there after the sale; to the best of my knowledge and belief, Mr. and Mrs. Baldwin did these repairs. I never knew of Mr. Campfield making any claim upon the property while they lived there, only so far as his giving the deed to me. I lived next door to them from the time of the purchase by Campfield until they moved away. I should have been willing to give $850 for it at the time of the sale. I might give $50 more for it now. I believe the house rents for $100 a year.

There is a barn on the property. I have rented the barn from Mr. Campfield for the last four years, at $8 a year. The circumstances of Mr. Baldwin, at the time of the sale, were poor. His health was then poor; not able to earn his bread. (Objected to.)

*Cross-examined.* When I told Mr. Campfield that the property never cost him anything, he said it didn't. I have been a carpenter, and have made repairs to the house, but not while Mr. Baldwin lived there. Mr. Campfield has paid me, at least it was deducted out of the rent of the barn. Mr. Baldwin was in debt at the time of the sale by the Sheriff; had other debts besides the judgment. Property in Newark was considerably depressed in 1840.

*William F. Lines*, sworn for complainant. He states a conversation between him and defendant, in which the defendant spoke of selling the said house and lot in Canal street, and then proceeds thus : Mr. Campfield said that he had an idea of selling, and buying a lot and building a house ; the expression, I believe, was, of selling that place of father Baldwin's and building them a house ; he said he thought it would be better to sell that place and build a house for them ; then there would be no trouble afterwards. When he spoke of building a house for them, he meant, I suppose, Mr. Baldwin. At another time he said they had been up to his shop ; then he mentioned the name mother Baldwin ; he said she came up there and wanted the deed ; that he told her that if she would give him $300 he would give her the deed, and then he said, in a laughing way, where's the $300 to come from ? He said they had been up there trying to come their games over him, and that Uncle Charley had been there to get something out of him. In a subsequent conversation with me he said they had called him everything but a clever fellow. I then told him, Edward, you hadn't ought to do wrong because they have done wrong; we all know that Mr. Baldwin hasn't done right, but Mrs. Baldwin has worked hard to keep that little property ; and then he said, let them use me well, and not call

me everything but a clever fellow. When I told him he ought not to do wrong because they had, I referred to his holding the deed. The way I understood it, from what he told me, was, that he was holding it in trust; I supposed for Mr. Baldwin; he gave me all the information, all I ever knew about it. I think he said it was put up at auction, and he was requested to be there to buy it in, Mr. Baldwin requested him to be there to buy it in, there would be some one to pay the money for it, that Uncle Charley would be there to pay the money for it, after he had bid on it and it was knocked off to him, and there was no one to pay the money for it; then he spoke about having to scratch round to get it settled, to know something about it. I think he said he gave a note for it, and that Mr. Olds endorsed it; and that it was protested; and he either said that another note was about to become due and would be protested, or that it had become due and had been protested; I don't know which. I think this conversation was after the suit was commenced. I think he said the notes were not paid and wouldn't be paid by him. I don't remember that he ever said anything had been paid by him on account of the property. He didn't say, or give any reason why that $300 was required to be paid by him.

*Cross-examined.* (Unimportant.)

*Re-examined.* In one of the conversations Mr. Campfield spoke of what he could get for the property; whether it was $1,000 or $1,200 I don't remember; this was at the conversation when he talked about selling that place and buying and building another; and I told him at the time I thought it ought to bring $1,600 or $1,700; and that is my opinion of its value.

*Benjamin Beaston,* sworn for complainant. I have known Mr. Baldwin about 18 years. I know Mr. Campfield now, but did not know him at the time of the transaction. I know the house and lot formerly occupied by Mr. Baldwin in Canal street. I recollect about its being advertised by the Sheriff for sale; don't recollect the year. I was apprised by Mr. Jacob Alyea about

it, and saw it in the paper also. Mr. Alyea jogged my mind about it several times. I had no agency or part in buying in that property at the Sheriff's sale; was not there. After the property was bought in I advanced some money, that is, I did this, Mr. Campfield's note was presented to me with Mr. Alyea's indorsement, and John Y. Baldwin's indorsement, for some sum over $100, between $100 and $130; my impression is that it was $126. This money was to pay a certain amount for which the property was bid in by Mr. Campfield. I think the Sheriff took the money from me. This note was not paid when it became *due,* and went to Mr. Alyea for the reason. It is probable the note was renewed once without any payment, don't know as to this; it was renewed at any rate, and Mr. Alyea paid $50 of it, and the note was renewed for the balance. After the note got down smaller I applied to Mr. Campfield. I was not treated by Mr. Campfield as though it was a business note. What he said left the impression on my mind that I was not to get it from him without law; there was something said that it was a family concern. There were three payments before the note was taken up; the first was Mr. Alyea's; Mr. Charles Taylor became accountable for $50 of it, which was paid; and the third came through Mr. Campfield's notes, indorsed by some one; it was paid in the bank; that was over $40; I think $46. Mr. Baldwin's son was at work for Mr. Taylor, at that time, and he said the boy was to leave so much of his wages out, and he would give $50, and did pay me $50. Mr. Baldwin applied to Mr. Taylor to make this arrangement, and took me there. After trying to get Mr. John Y. Baldwin, the other indorser, to pay the balance of the note, and not succeeding, I went to Mr. Campfield to get the balance, which I had not intended to do, because, if I had succeeded in getting anything, $5 or $10 from J. Y. Baldwin, I intended to have made a present of the balance, as I thought, to Jeremiah Baldwin's family, which I was willing to do to secure a home for his family.

*Cross-examined.* Mr. Campfield came to my store with the money to pay the last note; whether I went to the bank or he

went, I can't say, for the note; it is my impression that the note was lying at the bank.

*Robert C. Baldwin,* a son of complainant, called for complainant, was objected to as interested, being an heir at law of Jeremiah Baldwin, the complainant, who had died since the commencement of the suit. Being examined on his *voir dire,* he says he has no interest in the event of the suit; that he has conveyed his interest in the property to his mother, for board due from him to his mother, he working out and receiving wages while he boarded with her.

Being *sworn in chief,* subject to the objection, he says : At the request of my mother I spoke to Mr. Campfield, and told him that she wished him to give her a deed for the property, (the Canal street property spoken of.)   He said he didn't like to do that for fear she could not hold the deed, and he thought it would be better to sell the property, and buy a lot somewhere in the outskirts of the town, where property was not so valuable, and put up a small house there, and give my mother a deed for that property, as then there would be no disturbance, no law suit against the new property, and she could hold it much safer ; on account of the judgment being against the property in Canal street, he didn't feel safe about it.   He said that this property would sell for enough to pay the mortgage on it and leave enough to pay for the new house and lot, or nearly so ; so, at any rate, as to leave only about $200 on it.   He never said anything to me about who paid the purchase money for the lot in Canal street.   I do not know how Mr. Alyea was paid for the advance he made.   My father was working for him at the time the property was sold.   After the Sheriff's sale, and until they moved in Pennington street, my father and mother continued to reside upon the property; and while they lived there the interest on the mortgage was paid by the family ; my mother paid it. Mr. Campfield also told me that he did not want to hold the property, that it was a trouble to him, and he wanted to get clear of it, but he was afraid my mother couldn't hold it.   In

none of the conversations I have had with Mr. Campfield about the property has he ever said that he had any interest in it, or that he had anything coming to him on it.

*Cross-examined.* My mother paid the interest on the mortgage, all that was paid, up to the time we moved to Pennington street; I think the last six months' interest was not paid before we moved; I never heard anything to the contrary but what she paid the interest; I took most of the money myself. Mr. Campfield never furnished any money to pay the interest on the mortgage, without it was the last six months we were there; as to that I couldn't say; I am under the impression that it was not paid when we left there. I do not remember to whom Hall paid the purchase money for the strip, whether to my mother or to Mr. Campfield. That purchase money went to pay the balance that was over on the Beaston note; I heard Mr. Campfield say that that was what he wanted the money for; Mr. Campfield got the money.

*Re-examined.* I have heard Mr. Campfield speak about the Beaston note; about its not being paid; he said that it wasn't paid, that it ought to be paid, that Beaston was at him about it a number of times, and he couldn't pay it. I do not know that he said who ought to pay it; but from the way it was talked about it was perfectly understood who ought to pay it.

*John Humphreys,* sworn for complainant. I married a daughter of Jeremiah Baldwin. Mr. Campfield told me the premises were sold at Sheriff's sale, and that he was the purchaser at the sale. The sale was before my connection with the family. I have no interest in this cause; my wife and I have made a conveyance of our interest in the property. Mr. Campfield told me that father Baldwin had got in difficulty, and the place in Canal street had been sold, at Sheriff's sale, and he had a deed for it; previous to which, however, he told me something about a deed which had been given him for it, but had never been recorded. He said that "ma" wanted a deed for it, but he

thought she couldn't hold it. He was willing, he stated, to give it up to any one they might designate; I forget exactly the words; that he wanted to get clear of it, he had trouble enough with it. He said they had let a note of his get protested. He asked me, I believe, at the same time, what he had best to do about it. I remarked that he had better keep it himself, I thought, as far as I knew about it. He said that he didn't want to have anything more to do with the place; I think those were his words. He stated to me at another time that he should sell the property in Canal street, he believed, that was the best, he thought, and pay off the mortgage on it, and invest the balance in a house and lot that would cost less. He stated to me, either at that time or another, that the place had not cost him anything, and gave me to understand that he held it in trust for the old folks. I asked him, at one of the interviews we had, about the note. He stated that he had given a note for between forty and fifty dollars, if I recollect right, that that note had been protested, wouldn't care a damn about it if it hadn't been for that; that he had to borrow that money. I asked him if that money had never been paid back. He stated to me that there had been a strip of land sold off of the lot, and that had finally paid it. When I told him he had better keep the deed himself I had just been married, and didn't know there was any trouble about the property, and I merely meant to say to him that he had better keep the title himself. He said that he had rather been forced into it, that he didn't want to do it in the first place. I think he proposed to give the deed for the new property he proposed to buy to mother Baldwin; he was willing to do that provided she could hold it. He distinctly said that he hadn't paid anything for the property except the $50 he had borrowed, and that that had been repaid to him. He stated that he purchased the property at the request of Mr. Baldwin.

*Cross-examined.* I have talked over this subject with Mrs. Baldwin very often. I gave the interest I have in the property to mother Baldwin; I got no consideration for it; it was a gift.

*Re-examined.* I am under no promise or obligation, directly or indirectly, to pay anything on account of the expenses of this suit. I believe there is an account of about $25, which a person owes me, that I have told mother Baldwin she might have to go on account of the expenses of this suit. I understood that Mr. Campfield held the property in trust from the fact that he said it cost him nothing, and that he wished to get clear of it afterwards. He told me he was willing to convey it to some other person to hold for the old folks; said he was willing to convey it to Robert, if "ma" thought he could hold it.

*Charles Taylor*, sworn for complainant. (He proves nothing additional of importance.)

*Mrs. Eliza Humphreys*, sworn for complainant. (Nothing additional of importance.

*Mary Hall*, sworn for defendant. Mrs. Baldwin has spoken to me frequently on the subject of the property in Canal street in possession of Edward Campfield. She said her husband was in some trouble in relation to some debts, and if Mr. Hall would purchase seven feet of land adjoining us, I think it was $50, that with something else would meet the debt and leave $6, and that she intended to give to Mr. Campfield, for he was a poor man, for his trouble. I never heard her say whether Mr. Campfield was the owner or not of that property; she said it was put in her son-in-law's hands, and she expected to come back again to the property.

*Cross-examined.* Mr. Hall purchased the seven feet off the lot: he made the bargain with Mrs. Baldwin. Before Mrs. Baldwin moved from that house she told me the reasons of her moving; that Mr. Campfield would pay the rent where she was going to; the money that was coming from the rent of Mr. Campfield would pay the rent of the other; she said the rent would pay the interest on a $600 mortgage which was on the

property also. The rent which she said would pay the rent of the other house was to come from the house in Canal street.

*Question.* Did Mrs. Baldwin ever say that the house was ever held by Campfield in trust?

Yes, she always said so. I understood the property was bought with that debt on it, and she was to raise the money to pay it.

*Re-examined. Question.* Did Mrs. Baldwin say that Campfield held that property in trust, or did she say that he held it so that their creditors should not take it away from them?

I think she expected some other debt was coming against them.

*Question.* Did you understand that this property was put in Campfield's hands only to protect it from creditors?

I always understood it so.

*Again cross-examined.* I always understood that the property was bought in at the sheriff's sale, for the benefit of the family, at the request of some member of the family. (Objected to by defendant's counsel.) Mrs. Baldwin told me her son had worked to raise the money, besides the $50, towards paying the sheriff; and she has told me about raising money by borrowing from Mr. Alyea and Mr. Beaston for the purpose of paying towards the place.

*Garret Sandford,* sworn for the defendant. I have heard Jeremiah Baldwin say that Edward Campfield bought the property (spoken of).

*Cross-examined. Question.* Did Mr. Baldwin ever tell you that Campfield had refused to deed the property to him, or refused to do as he agreed, or had deceived him? (Objected to by defendant's counsel).

He told me they were about commencing a suit in Chancery; and in speaking of Campfield, he was afraid the boy was going to deceive him, or had or would deceive him, or something to that effect.

*Stephen R. Grover,* sworn for the defendant. Mr. J. Baldwin was frequently in my office, and Mr. Campfield with him. I was the attorney in the judgment upon which the property was sold. From conversations I had with Mr. Baldwin and Mr. Campfield I got the impression that Mr. Baldwin had, previously to the sheriff's sale and to the judgment, conveyed the property to Mr. Campfield, but for what purpose, or what the consideration was, I don't know. After the sale I understood from the parties that Mr. Campfield bought it. Mr. Baldwin and Mr. Campfield were at my office and talked about the property after the sale. There was a payment made by Mr. Campfield or some one for him. On the 15th of April, 1840, Mr. Campfield, or some one for him, paid me $45, and I, as attorney for the plaintiff in the judgment, agreed to wait for the balance of the purchase money on Jacob Alyea's being security for nine months. I think that both Mr. Campbell and Mr. Baldwin were there at the time.

*Cross-examined.* I have no distinct recollection as to anything being said about Campfield's holding the property for the benefit of the family, and to give the family an opportunity of raising the money.

*Question.* Whether, from what was said or took place before you, you inferred or got the impression that Mr. Campfield bought the property for the benefit of Mr. Baldwin or his family. (Objected to by Mr. Frelinghuysen).

From the relation of the parties, from the manner in which the business was transacted, I got the impression that it was for the benefit of Mr. Baldwin and his family, although I can't recollect any particular conversation from which I got that impression.

*A. Whitehead* for the complainant. He cited 2 *Story's Eq. Jur.* sec. 1201; 14 *Law Lib.* 85; 2 *John. Ch.* 408; 7 *Cranch,* 176.

*F. T. Frelinghuysen* for the defendant. He cited 1 *Story's*

*Eq. Jur.* sec. 354, 371, 425; 2 *Myln. & Kean,* 496; 2 *Halst. Ch.* 496.

THE CHANCELLOR. There can be no doubt, that the first deed from the complainant to the defendant, and the arrangement, at the sheriff's sale, by which the property was struck off and conveyed to the defendant and the purchase money paid by the complainant, were both made for the fraudulent purpose of putting, or attempting to put, the property beyond the reach of the creditors of the complainant. No trust can result in favor of the complainant from such a transaction.

Bill dismissed.